UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
WATER QUALITY INSURANCE             )
     SYNDICATE,                     )
                                   )
          Plaintiff,                )
                                   )
     v.                             )   Civil Action No. 03-0687 (PLF)
                                   )
UNITED STATES OF AMERICA,           )
                                   )
          Defendant.                )
_____)

OPINION

Plaintiff Water Quality Insurance Syndicate ("WQIS") filed this lawsuit under the Administrative Procedure Act, 5 U.S.C. § 701 *et. seq.*, seeking judicial review of the final agency action of the United States Coast Guard National Pollution Funds Center ("NPFC") denying plaintiff's claim under the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et. seq.*, for reimbursement of uncompensated damages and removal costs incurred in connection with an oil spill off Puerto Rico on January 7, 1994.  See Amended Complaint ("Am. Compl.") at 1.  This matter is before the Court on the parties' cross motions for summary judgment based on the administrative record before the agency.[1]

---

[1]    The papers submitted to the Court in connection with these motions include: Defendant's Memorandum in Support of its Motion for Summary Judgment ("Def. Mem") and Statement of Material Facts in Support of its Motion for Summary Judgment ("SMF"); Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp."); Plaintiff's Motion for Summary Judgment ("Pl. Mem."); Opposition of United States to Plaintiff's Cross Motion for Summary Judgment ("Def. Opp."); Plaintiff's Reply to Defendant's Opposition to Motion for Summary Judgment ("Pl. Reply"); the Administrative Record ("A.R."); and the Supplement to the Administrative Record ("S.A.R.").

For the reasons explained below, the Court will deny defendant's motion for summary judgment, will grant in part and deny in part plaintiff's motion for summary judgment, and will remand this matter to the NPFC for further proceedings consistent with this Opinion.

I. BACKGROUND

*A. Factual Background*

The undisputed facts underlying this lawsuit were set forth succinctly in defendant's Statement of Material Facts in Support of its Motion for Summary Judgment, and will be repeated here.[2]

On the evening of January 6, 1994, the tug EMILY S began a trip to tow the tank barge MORRIS J. BERMAN, which was half-loaded with fuel oil, from San Juan, Puerto Rico to Antigua (A.R. 252, 644, 710, 855-56, 900). Some time between 12:30 a.m. and 1:30 a.m. on January 7, 1994, the towline connecting the tug and barge parted (A.R. 252, 858). The tug crew retrieved the MORRIS J. BERMAN and repaired the tow wire by installing an emergency "soft eye" in the tow wire, made by clamping the wire with five saddle bolt clamps through a shackle in the towing bridle attached to the barge (A.R. 644, 651-53, 782). Although available, no metal "thimble" was installed in the emergency soft eye to prevent the shackle from rubbing against the tow wire (A.R. 652-53, 718-22).

Several hours later, the tow wire parted again and the barge was set adrift. The second towline parting went unnoticed by the sole watchstander aboard the tug (A.R. 661-62, 864). The towline parted the second time at the point where the soft eye had been added to the

---

[2] Plaintiff stated in its opposition brief that it does not dispute defendant's Statement of Material Facts, which the Court therefore accepts. See Pl. Opp. at 1.

tow wire (A.R. 784). At approximately 4:00 a.m. on January 7, 1994, the MORRIS J. BERMAN stranded on a reef at Escambron Beach, Puerto Rico, spilling 798,000 gallons of fuel oil onto the beach and surrounding waters (A.R. 392-93, 643, 987-89).

The MORRIS J. BERMAN displaced 5,377 gross tons (A.R. 401). It was owned and operated by New England Marine Services (A.R. 401). The EMILY S was bareboat chartered by the Bunker Group Incorporated, and operated by the Bunker Group of Puerto Rico, Inc. (A.R. 401). All the companies were deemed "responsible parties" for the oil spill by the United States Coast Guard (A.R. 392).[3]

At the time of the oil spill, plaintiff Water Quality Insurance Syndicate insured the MORRIS J. BERMAN for pollution risks pursuant to a $10 million insurance policy. New England Marine Services, the Bunker Group Incorporated and the Bunker Group of Puerto Rico – the "responsible parties" – were named as insureds (A.R. 393, 394). WQIS also executed a Certificate of Financial Responsibility ("COFR"), issued by the United States Coast Guard, in the amount of $806,550 for the MORRIS J. BERMAN (A.R. 397-98, 412-21).[4] The COFR had become effective on December 15, 1993.

Less than a month after the oil spill, on February 4, 1994, the National Pollution Funds Center ("NPFC"), on behalf of the Oil Spill Liability Trust Fund ("the Fund"), sent an

---

[3] Under the Oil Pollution Act, a "responsible party" is defined with respect to vessels as "any person owning, operating or demise chartering the vessel." 33 U.S.C. § 2701(32)(A).

[4] Under the Oil Pollution Act, a "guarantor" is defined as "any person, other than the responsible party, who provides evidence of financial responsibility for a responsible party under this Act." 33 U.S.C. § 2701(13).

interim invoice to WQIS and New England Marine Services in the amount of $7,356,108.72 for oil removal expenses incurred by the Fund as a result of the oil spill (A.R. 422-26; S.A.R. 1-4). On March 14, 1994, WQIS paid the Fund $806,550, representing the amount of its COFR (S.A.R. 5-6). On November 12, 1994, WQIS paid the Fund an additional $3,700,000 (S.A.R. 5-6).

On September 26, 1996, New England Marine Services, Bunker Group Incorporated, Bunker Group of Puerto Rico, and Pedro Rivera, a shoreside manager for Bunker Group of Puerto Rico, were convicted of violating 46 U.S.C. § 10908 for knowingly sending the EMILY S to sea in an unseaworthy condition likely to endanger life (A.R. 346-58). Mr. Rivera alone appealed the conviction. On December 2, 1997, the United States Court of Appeals for the First Circuit, *en banc*, reversed Mr. Rivera's conviction, finding that while the evidence at trial was sufficient to show that Mr. Rivera knew the vessel was unseaworthy when it departed (based on the poor condition of the tow wire), the evidence was insufficient to show that he knew the vessel's unseaworthy condition was likely to endanger the life of an individual. See United States v. Rivera, 131 F.3d 222 (1st Cir. 1997) (*en banc*).[5] The convictions of the corporate responsible parties were not appealed and therefore stand.

On December 14, 1998, WQIS submitted a claim to the NPFC for $9,558,376.98 against the Fund, including the $4,506,550 previously paid to the NPFC and $5,051,826.90 allegedly paid directly to contractors for oil removal expenses. (A.R. 389-407). In July 2002,

---

[5] 46 U.S.C. § 10908 provides that "[a] person that *knowingly* sends or attempts to send, or that is a party to sending, or attempting to send, a vessel of the United States to sea in an unseaworthy state that is likely to endanger the life of an individual" shall be punished criminally (emphasis added).

WQIS brought this action in the United States District Court for the Southern District of New York, seeking judicial review of the denial of its claim. Although the NPFC had not yet decided the claim at that time, under the applicable regulation this inaction could properly be deemed a denial. See 33 C.F.R. § 136.115(c). By stipulation the lawsuit was transferred to this Court. In the interim, the NPFC formally denied the WQIS claim on August 22, 2002 (A.R. 4-13) ("August 22, 2002 Denial of Claim"). A request for reconsideration of the denial of the claim resulted in the NPFC reaffirming its denial on January 21, 2003 (A.R. 2-3) ("January 21, 2003 NPFC Denial of Reconsideration"). The Denial of Reconsideration is a final agency action for purposes of the Administrative Procedure Act (A.R. 2).

*B. Relevant Statutory Framework*

Judicial review of final agency actions is governed by Section 706 of the Administrative Procedure Act. See 5 U.S.C. § 706; see also City of Las Vegas v. Lujan, 891 F.2d 927, 932 (D.C. Cir. 1989). The reviewing court may set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. See 5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375 (1989). The party challenging an agency's action as arbitrary and capricious bears the burden of proof. See City of Olmsted Falls v. F.A.A., 292 F.3d 261, 271 (D.C. Cir. 2002). To survive review under the "arbitrary and capricious" standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." PPL Wallingford Energy LLC v. Federal Energy Regulatory Comm'n, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (citing Motor

Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)) (internal citations and quotations omitted).  The reviewing court must affirm the agency if "a rational basis for the agency's decision exists" even if not entirely clear, so long as "agency's path may reasonably be discerned."  Hornbeck Offshore Transportation v. United States Coast Guard, 424 F. Supp. 2d 37, 45-46 (D.D.C. 2006); see also Smith Property L.L.C. v. United States, 311 F. Supp. 2d 69, 83-84 (D.D.C. 2004) ("where the agency's explanation for its conclusion is reasonable, the APA does not permit the Court to substitute its judgment for that of the agency.").  Moreover, "agency decisions must generally be affirmed on the grounds stated in them."  Hornbeck Offshore Transportation v. United States Coast Guard, 424 F. Supp. 2d at 49 (quoting Ass'n of Civilian Technicians v. Fed. Labor Relations Auth., 269 F.3d 1112, 1117 (D.C. Cir. 2001) and citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).  A reviewing court may not attempt itself to make up for any deficiencies in the agency's decision or rationale by supplying "'a reasoned basis for the agency's action that the agency itself has not given.'"  Hornbeck Offshore Transportation v. United States Coast Guard, 424 F. Supp. 2d at 45 (quoting Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43).  "'Post-hoc rationalizations, developed for litigation, are insufficient.'"  Hornbeck Offshore Transportation v. United States Coast Guard, 424 F. Supp. 2d at 49 (quoting Ass'n of Civilian Technicians v. Fed. Labor Relations Auth., 269 F.3d at 1117).

Congress passed the Oil Pollution Act of 1990 in response to the disastrous March 1989 oil spill involving the EXXON VALDEZ in Prince William Sound, Alaska.  See In re the Complaint of Metlife Capital Corp., Commonwealth of Puerto Rico v. M/V Emily S, 132 F.3d 818, 820 (1st Cir. 1997); Hornbeck Offshore Transportation v. United States Coast Guard, 424 F.

Supp. 2d at 39; Smith Property Holdings, 4411 Connecticut L.L.C. v. United States, 311 F. Supp. 2d at 70. The OPA imposes strict liability on parties that discharge oil into the navigable waters of the United States. Specifically, the Act states:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a).

An "incident" is defined under the Oil Pollution Act as "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil[.]" 33 U.S.C. § 2701(14). As noted above, a "responsible party" with respect to vessels is defined as "any person owning, operating or demise chartering the vessel." 27 U.S.C. § 2701(32)(A). A "guarantor" is defined as "any person, other than the responsible party, who provides evidence of financial responsibility for a responsible party under this Act." 27 U.S.C. § 2701(13). The parties agree that in this case plaintiff is a guarantor under the Act, and is not a responsible party. See Def. Mem. at 6.[6]

The OPA provides:

> [A] claim for which liability may be established under section 2702 of this title may be asserted directly against any guarantor providing evidence of financial responsibility for a responsible

---

[6] Plaintiff is an OPA "guarantor" only up to the amount of the Certificate of Financial Responsibility, $806,550. See Pl. Opp. at 5-9; see also supra at 3; August 22, 2002 Denial of Claim (A.R. 6).

>           party liable under that section for removal costs and damages to
>           which the claim pertains.  *In defending against such a claim, the
>           guarantor may invoke . . . the defense that the incident was caused
>           by the willful misconduct of the responsible party.*  The guarantor
>           may not invoke any other defense that might be available in
>           proceedings brought by the responsible party against the guarantor.

33 U.S.C. § 2716(f)(1) (emphasis added).  Thus, while a claim may be asserted against a guarantor, there is a defense in the OPA for guarantors, based on the willful misconduct of a responsible party.

The OPA provides for the availability of the Oil Spill Liability Trust Fund ("the Fund") for the "payment of claims in accordance with section 2713 of this title for uncompensated removal costs determined by the President to be consistent with the National Contingency Plan or uncompensated damages." 33 U.S.C. § 2712(a)(4).  A "claimant" is "any person or government who presents a claim for compensation under this subchapter." 33 U.S.C. § 2701(4).  A "person" is "an individual, corporation, partnership, association, State, municipality commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 2701(27).

## II.  DISCUSSION

The National Pollution Funds Center denied WQIS's claim for uncompensated removal costs arising from the MORRIS J. BERMAN oil spill on two grounds.  First, with respect to the $806,550 COFR Guarantee payment, the NPFC found that WQIS had not proved that the incident was "caused by the willful misconduct of [any] responsible party" under Section 1016(f) of the Oil Pollution Act, 33 U.S.C. § 2716(f), because (a) the sole proximate cause of the spill was the improper repair of the tow wire, a negligent act; (b) willful misconduct cannot be a

negligent act; by definition, it is an act intentionally done, with knowledge that the intentional act will probably result in injury; and (c) a series of negligent acts does not constitute willful misconduct. (A.R. 2-3, 7, 10, 12). "[I]f there was any willful misconduct . . . it was not the proximate cause of the oil discharge. There were numerous acts of negligence [by responsible parties] which contributed to the discharge and one act of negligence (improper repair of the towline with no thimble) which was the proximate cause of the discharge." August 22, 2002 Denial of Claim (A.R. 12).

Second, the NPFC found that, with respect to the money paid out under its $10 million policy insuring the MORRIS J. BERMAN for pollution risks, WQIS could not rely on the policy defense or exception that it was not responsible if the incident was caused by the willful misconduct of the insured because, according to the NPFC, claims by insurers asserting policy defenses are not covered by Section 1016, 33 U.S.C. § 2716. See August 22, 2002 Denial of Claim (A.R. 6-7). According to the agency, "[f]or those sums expended not covered by a guarantee under Section 1016, the insurer 'steps into the shoes' of the RP [responsible party] and the insurer's rights . . . would be the same as any responsible party's rights for removal costs. . . . [A]n insurer does not have a claim for uncompensated removal costs unless the RP has such a claim." Id. Plaintiff asserts that each of these articulated reasons is an error of law which is "arbitrary and capricious" within the meaning of the APA.

Plaintiff also argues that the agency's other rationales for the denial of the claim -- asserted not in the agency's denial of plaintiff's claim but only in the context of this lawsuit -- are post hoc rationalizations and therefore should not be considered by the Court on review of the agency's decision. See Pl. Opp at 4. The Court agrees. Under established law, the Court may

review only the reasons articulated in the agency decision itself.  See Ass'n of Civilian Technicians v. Fed. Labor Relations Auth., 269 F.3d at 1117 ("Agency decisions must generally be affirmed on the grounds stated in them."); Hornbeck Offshore Transportation v. United States Coast Guard, 424 F. Supp. 2d at 48-49 (same).

### A.  OPA Defense for Willful Misconduct of a Responsible Party

With respect to the COFR Guarantee amount, plaintiff argues that because the incident was caused by the willful misconduct of the responsible parties, it is not liable under the OPA, which expressly provides a defense for guarantors under those circumstances.  See 33 U.S.C. § 2716(f) ("In defending against such a claim, the guarantor may invoke . . . the defense that the incident was caused by the willful misconduct of the responsible party.").  Plaintiff asserts that the decision by the United States Court of Appeals for the First Circuit in the related criminal case supports its position insofar as the First Circuit specifically upheld the jury's finding that "Rivera knowingly sent an unseaworthy vessel to sea."  United States v. Rivera, 131 F.3d 222, 229 (1st Cir. 1997) (*en banc*).[7]  Defendant responds that the determination of the First Circuit that Mr. Rivera knowingly sent a vessel to sea in an unseaworthy condition is not the same as a finding that the same conduct constitutes "willful misconduct."  See Def. Mem. at 14.  The Court agrees -- not only because willfulness and knowledge are two different things, but also because, in the absence of a special verdict form or special interrogatories, one can never really

---

[7]  The First Circuit nevertheless reversed Rivera's conviction because there was insufficient evidence for the jury to conclude that Rivera knew that the unseaworthiness would likely endanger life, a separate element of the criminal statute.  See United States v. Rivera, 131 F.3d at 231.  As plaintiff correctly notes, the convictions of the corporate responsible parties were not appealed and therefore stand.  See Pl. Mem. at 10.

know what facts a jury has found.  The most that can be said is that upon its review of the transcript, the First Circuit found ample evidence on which the jury could have based a finding that Rivera knowingly sent an unseaworthy vessel to sea, but insufficient evidence that he knew the vessel's unseaworthiness was likely to endanger human life.  See United States v. Rivera, 131 F.3d at 229-31.

What is significant is the agency's determinations that (a) the sole proximate cause of the oil spill was the faulty repair of the tow line, and (b) because the faulty repair was a negligent act (not an intentional one), it cannot constitute willful misconduct.  See Def. Mem. at 15-17; January 21, 2003 NPFC Denial of Reconsideration (A.R. 2-3).  To constitute "willful misconduct," according to the agency, there must be a single act, intentionally done, that proximately caused the spill; a series of negligent acts will never suffice.  See January 21, 2003 NPFC Denial of Reconsideration (A.R. 2-3).  In denying plaintiff's claim, the agency used the following definition of "willful misconduct":

> Willful misconduct is an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an inference of reckless disregard of the probable consequences.  A series of negligent acts does not constitute willful misconduct.

Def. Mem. at 11; see also January 21, 2003 NPFC Denial of Reconsideration (A.R. 2-3).

The defendant is wrong for at least two reasons.  First, the agency erred when it focused on the "oil spill" or the "discharge," rather than on the broader meaning of the statutory term "incident."  The relevant question for this case is not whether the willful misconduct was the *proximate cause of the oil spill*.  Rather, the relevant question is whether the "incident was caused by the willful misconduct of the responsible party." 33 U.S.C. § 2716(f)(1)(C).  The

agency's decision thus appears to focus on the wrong question, and its analysis leads to the erroneous conclusion that a series of negligent acts cannot constitute willful misconduct. An "incident" is defined in the statute as "any occurrence or *series of occurrences* having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil[.]"  33 U.S.C. § 2701(14) (emphasis added). The "incident," therefore, is not the oil spill.  Under the plain language of the statute, the incident is what caused the spill.  More importantly, the "incident" may be a "series of occurrences" resulting in the oil spill.  While the faulty repair of the tow line was part of the series of occurrences that led to the discharge of the oil, the agency was wrong under the statute to focus on any one occurrence, event or cause as the proximate cause of the spill.  It should have looked at the "series of occurrences" or events that together constitute the "incident" that led to the spill.

Second, the agency erred in concluding that "willful misconduct" must be a single act "intentionally done" and that a series of negligent acts can never constitute willful misconduct.  See January 21, 2003 NPFC Denial of Reconsideration (A.R. 2-3).  As plaintiff points out, the question of the definition of  "willful misconduct" under the predecessor statute to the Oil Pollution Act was addressed by the Second Circuit in In re Tug OCEAN PRINCE. 584 F.2d 1151 (2d Cir. 1978).  The Second Circuit defined "willful misconduct" much more broadly than the agency did here, as follows:

> [T]his circuit has established the following criteria for a finding of willful misconduct:  an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an inference of a reckless disregard of the probable consequences.   If the harm results from an omission, the omission must be intentional, and the actor must either know the omission will result in damage or the circumstances surrounding

> the failure to act must allow an implication of a reckless disregard
> of the probable consequences. The knowledge required for a
> finding of willful misconduct is that there must be either actual
> knowledge that the act, or the failure to act, is necessary in order to
> avoid danger, or if there is no actual knowledge, then the
> probability of harm must be so great that failure to take the
> required action constitutes recklessness.

In re Tug OCEAN PRINCE. 584 F.2d at 1163 (internal citations omitted) (citing Second Circuit cases decided under the Warsaw Convention).

The court in OCEAN PRINCE then focused on the "reckless disregard" portion of the definition of "willful misconduct" -- recognized in passing by the agency here, but totally disregarded in its analysis. As the Second Circuit put it:

> This case is unlike *Grey v. American Airlines*, [227 F.2d 282 (2d
> Cir. 1955)], in which the court found that even if there had been
> pilot error, that fact, by itself, did not necessarily constitute willful
> misconduct. It is, rather, the combination of factors which together
> indicate a probable consequence of damage resulting from several
> failures to act, and by continuing to fail to act in the face of that
> probability, that indicates a reckless disregard of the consequences.
> While any one of the faults of Red Star alone, even within privity,
> may not constitute "willful misconduct", on the entire record the
> various inactions and gross disregard of the potential harm amount,
> in our opinion, to willful misconduct within the meaning of the
> statute. Otherwise, it would be difficult to imagine what would be
> necessary to make a tug company liable for the costs of cleaning a
> negligent oil spill save an admission of an actual intent to do so,
> and would extend to the tugboat industry an almost absolute
> exemption from liability for pollution cleanup costs.

In re Tug OCEAN PRINCE, 584 F.2d at 1164.

The court in OCEAN PRINCE made clear that its conclusion that there was willful misconduct was based on no single proximate cause, but on an "accumulation of acts," "a chain of circumstances which [were] a contributing cause even though not the immediate or

proximate cause of the casualty." In re Tug OCEAN PRINCE, 584 F.2d at 1158. Furthermore, "the casualty occurred as a result of negligence and unseaworthiness" within the knowledge of the responsible party. See id. at 1159; see also id. at 1160, 1163 (failure to post a lookout when conditions required was negligent and, because knowingly done, warranted inference that Red Star acted in reckless disregard of probable consequences); id. at 1161 (Red Star guilty of negligence). The Second Circuit reversed the trial court in OCEAN PRINCE and found that the series of negligent acts, rising to reckless disregard, constituted willful misconduct. See id. at 1163-64; see also Bayer Corp. v. British Airways, 210 F.3d 236, 239 (D.C. Cir. 2000) (willful misconduct can be shown by showing the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences); Saba v. Compagnie Nationale Air France, 78 F.3d 664, 667 (D.C. Cir. 1996) (reckless disregard is equivalent to willful misconduct under the Warsaw Convention). Similarly, this Court is persuaded that the decision of the responsible parties in this case *knowingly* to send an unseaworthy vessel to sea, along with the accumulation of other acts that resulted in the oil spill, constitutes reckless disregard and willful misconduct, and that the agency therefore erred when it concluded that the OPA defense of willful misconduct did not apply.

### *B. Availability of "Willful Misconduct" Policy Defense*

With respect to the payments plaintiff made under the $10 million dollar insurance policy and over the COFR Guarantee amount, defendant argues that an insurer may not bring an action to recover uncompensated damages and removal costs against the Fund based on an insurance policy defense of willful misconduct, because an insurer only has the rights that the

insured has -- that is, the insurer "steps into the shoes" of the insured, a responsible party under the statute. See January 21, 2003 NPFC Denial of Reconsideration (A.R. 2-3). Because in this case the insured responsible parties do not have a claim against the Fund, defendant argues, neither does plaintiff, the insurer, which has only the rights it acquired by subrogation. See Def. Mem. at 17-20. Unfortunately, the agency's decision relies on a legal doctrine (subrogation) that does not apply, and is devoid of any analysis whatsoever. The decision simply makes the bare assertion that a guarantor does not have a claim for removal costs because the responsible party has no such claim. See August 22, 2002 Denial of Claim (A.R. 6-7) ("For those sums not covered by a guarantee under Section 1016, the guarantor 'steps into the shoes of' the responsible party and the guarantor's rights against the Oil Spill Liability Trust Fund (OSLTF) would be the same as any responsible party's rights for removal costs against the OSLTF.").

Defendant has not cited any cases under the Oil Pollution Act to support its position. See Def. Mem. at 17-20. Defendant does cite Quarles Petroleum v. United States, 551 F.2d 1201 (Ct. Cl. 1977), a decision by the United States Court of Claims under the predecessor statute to the OPA, the Federal Water Pollution Control Act. The Court has read the case carefully and concludes that Quarles Petroleum is not the least bit relevant to the question in this case. In Quarles Petroleum, suit was brought by an insured company on behalf of its insurance carrier, seeking compensation for removal costs after its insurance company had paid for the removal of plaintiff's oil spill. The court in Quarles Petroleum allowed the insured company to bring an action as an owner-operator of a vessel for compensation, pursuing the rights that its insurance company had acquired by subrogation. See Quarles Petroleum v. United States, 551 F.2d at 1204 (insurance company was obligated to pay expense of removal "and after payment

became subrogated to the insureds' rights of action by the terms of the insurance contract"; plaintiffs brought the action for "the use and benefit of the insurance company" whose economic interest was "actually at stake.").[8]

The fact that an insured company may bring an action pursuing rights that its insurance company has acquired by subrogation -- the holding of Quarles Petroleum -- tells the Court nothing about the question at issue here: whether an insurance company may bring its own independent direct claim as a "person" under the OPA against the agency for compensation from the Fund on the ground that it was not required to pay for removal costs under the express terms of the insurance policy. The claim that plaintiff WQIS is pursuing is not based on the subrogated rights of the OPA "responsible parties" that it insured, but rather is its *own* claim against the Fund under the OPA.

The $10 million oil pollution insurance policy issued by WQIS on December 29, 1993 expressly excludes coverage for any loss "arising from . . . the willful misconduct of the Assured, or the willful misconduct of the owner or operator of the vessel if within the privity or knowledge of the Assured." (A.R. 396-97). Since the incident was "caused by" the "willful misconduct" of a responsible party, see Section II.A. supra, it follows that it necessarily "arose from" such willful misconduct, thus providing an exception for liability for WQIS under its insurance policy. Accordingly, plaintiff asserts that it paid out money for removal costs that it was not required to pay out under the policy, and it is seeking compensation from the Fund for

---

[8] "[U]nder the doctrine of subrogation of insurance, an insurer can take nothing by subrogation but the rights of the insured, and is subrogated to only such rights as the insured possesses. In such circumstances, the subrogee 'stands in the place' of the insured and obtains equivalent but no greater rights than held by the insured." Quarles Petroleum v. United States, 551 F.2d at 1207.

itself, not for its insured.

Defendant's argument – that plaintiff is not a person who can present a claim on its own behalf against the Fund but rather only has the rights it acquired by subrogation – contradicts the plain language of the OPA. As noted above, the OPA provides for the availability of the Fund for the "payment of claims in accordance with section 2713 of this title for uncompensated removal costs determined by the President to be consistent with the National Contingency Plan or uncompensated damages." 33 U.S.C. § 2712(a)(4). A "claimant" is "any person or government who presents a claim for compensation under this subchapter." 33 U.S.C. § 2701(4). A "claim" is "a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident." 33 U.S.C. § 2701(3). The statute expressly provides that the Fund "shall not be available to pay any claim for removal costs or damages to a particular claimant, to the extent that the incident, removal costs or damages are caused by the gross negligence or willful misconduct *of that claimant*." 33 U.S.C. § 2712(b) (emphasis added). Thus, the statute expressly exempts the Fund from liability for claims of persons – such as the insureds in this case – whose gross negligence or willful misconduct caused an incident. The statute does *not* purport to exempt the Fund from liability for claims of guarantors and insurers such as plaintiff, which asserts that a policy defense exempts it from liability. There is no dispute in this case that plaintiff did not engage in gross negligence or willful misconduct that caused the incident.[9]

---

[9] Defendant states in its brief that plaintiff's request for reimbursement from the Fund for uncompensated removal costs "is contrary to the intent of OPA[,]" apparently because of the "special status under the Act" of guarantors and responsible parties. Def. Opp. at 15. Defendant's opinion of the intent or logic of a statute, however, cannot overcome the statute's plain language, which specifically distinguishes between those whose negligence or misconduct

    For these reasons, the Court concludes that the agency's denial of plaintiff's claim was based on legal errors, both with respect to the statutory willful misconduct defense and with respect to plaintiff's direct claim against the Fund.  Because the agency "denied this claim on a 'threshold' issue, [it] made no evaluation or determination as to the validity of the quantum of the costs submitted in the claims submission."  August 22, 2002 Denial of Claim (A.R. 13).  As a result, the Court will remand this matter to the Agency for further proceedings consistent with this Opinion.  The Court declines to grant judgment for the plaintiff on the merits, as plaintiff asks it to do, in light of the incompleteness of the agency's original analysis.  See id.  An Order accompanying this Opinion will be issued this same day.

                    _____/s/_____
                     PAUL L. FRIEDMAN
                     United States District Judge

DATE:  November 29, 2007

---

caused an incident and all other claimants.  Defendant also points to requirements of the claims process.  See id. (citing 33 U.S.C. §§ 2713(a), (b), 2714(c)).  This argument was not relied upon by the agency in its decision and therefore will not be discussed here.  See supra at 6.